UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

PHILIP SIMONE and GETRUDE
SIMONE,

                Plaintiffs,

                 v.

THE UNITED STATES OF AMERICA,

                Defendant.

-----------------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**

09-CV-3904 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiffs Philip Simone ("Plaintiff-Simone") and Gertrude Simone (together, "Plaintiffs") bring this action for negligence and malicious prosecution against the United States of America (the "Government" or "Defendant") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* (the "FTCA"). This action arises out of the Government's provisional arrest of Plaintiff-Simone pursuant to an extradition request that the United Mexican States ("Mexico") submitted to the United States in May 2007.

      On May 25, 2007, Mexican authorities first requested that the United States provisionally arrest "Phil Anthony Simone" for sexually molesting male youths in Guadalajara, Jalisco, Mexico in 2002. After a series of events, discussed in detail below, the Government, in compliance with Mexico's request, provisionally arrested Plaintiff-Simone on May 5, 2008. It is now *undisputed*, however, that Plaintiff-Simone, *i.e.,* "Philip A. Simone," did *not* commit the crimes for which he was arrested. Rather, those crimes were committed by a man named "Phil Anthony Simone." The questions raised in this litigation chiefly concern what, if any, legal

responsibility the Government bears for Plaintiff-Simone's arrest in this case of mistaken identity.

The Court held a bench trial from June 2, 2014 through June 6, 2014. After careful consideration of the evidence adduced at trial, the arguments of counsel, and the controlling law on the issues presented, the Court now issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. In sum, the Court concludes that as unfortunate as the circumstances of Plaintiff-Simone's arrest were, Plaintiffs lack sufficient legal and factual bases to prevail on their claims against the Government.

## I.   **Findings of Fact**[1]

### A.  The Plaintiffs

Plaintiffs Philip and Gertrude Simone are residents of the State of New York. (Dkt. 40 at 2-4 ("Stip. Facts") ¶¶ 1-2.) Plaintiff-Simone's arrest, the incident that is the subject of this litigation, occurred on May 5, 2008. (Tr.[2] 119-22.) At that time, Plaintiff-Simone was 51 years of age (PX 2)[3], had been married to Gertrude Simone for 16 years (Tr. 86, 116-17), and was in his 28th year of service as an employee of Merrill Lynch. (Tr. 116-17.) At that time, Plaintiff-Simone did not have a passport, and had not had one for 30 years. (Tr. 89.)

### B.  Underlying Crime in Mexico

In March 2002, two Americans, Phil Anthony Simone ("Perpetrator-Simone") and Thomas E. Grisard, engaged in a scheme to sexually prey on unsuspecting children in

---

[1] While many of the Court's findings of fact are ancillary to the Court's verdict, which is substantially based on the non-viability of Plaintiffs' negligence claim as a matter of law, the Court nonetheless sets forth these findings for the purpose of creating a complete record of the facts established at trial.

[2] "Tr." refers to the transcript of the bench trial held from June 2-6, 2014, located at Dkts. 79-81, 83, 84.

[3] "PX" refers to Plaintiffs' Exhibit, and "DX" refers to Defense Exhibit.

Guadalajara, Jalisco, Mexico. (PX 18 (DX Q)[4] at OIA 102-04.) Grisard and Perpetrator-Simone passed out flyers in the Plaza Tapatia of Guadalajara advertising English lessons in their apartment off the main square. Using these flyers, Grisard and Perpetrator-Simone lured homeless boys between the ages of 12 to 17 to their apartment, where the two perpetrators gave the boys English lessons, money, fruit, and clothing. Grisard and Perpetrator-Simone also got the boys drunk on wine and sexually molested them. At least three victims reported these crimes to the State police in Jalisco, which subsequently commenced an investigation. The three victims were shown photographs by the Jalisco police, and positively identified Grisard and Perpetrator-Simone as their assailants. (*Id.*) Prosecutors in Jalisco obtained an arrest warrant for Perpetrator-Simone, identified in the warrant as "Phil Anthony Simone," on April 2, 2005 from a criminal court judge in Puente Grande, Jalisco. (DX L at OIA 91.)

      C.  <u>FBI's Assistance to Mexico</u>

On March 27, 2006, the Embassy of Mexico, on behalf of the Mexican Attorney General's Office, contacted the Federal Bureau of Investigation ("FBI") International Operations Division ("FBI International") in connection with the investigation of Grisard and Perpetrator-Simone, as individuals wanted for the corruption of children and child prostitution in Jalisco, Mexico. (PX 1.) Mexico asked the FBI "to obtain photographs of Thomas E. Grisard (Social Security number ('SSN') [redacted])[5] and Phil Anthony Simone (SSN [redacted]-1576), who could be living in New Jersey and New York, respectively." (Tr. 290, 312-13; PX 1; DX A.)

By memorandum dated April 25, 2006, FBI Foreign Operations Specialist ("FOS") Cindy Norris forwarded the request to FBI Supervisory Special Agent ("SSA") Michael Butsch.

---

[4] PX 18 and DX Q are the same document. The Court will refer only to PX 18.
[5] Certain personal identification information has been redacted pursuant to Federal Rule of Civil Procedure 5.2.

The memorandum stated that the "[p]hotographs of Grisard and Simone will assist the EOM [Embassy of Mexico] in verifying their identity and location. *If the photograph[s] result in a positive identification,* EOM will ask for an extradition or deportation procedures." (DX B (emphasis added).)

SSA Butsch forwarded the request to the Newark FBI office, where it was assigned to FBI Special Agent Avgoustis Karaminas ("Agent Karaminas"). (Tr. 289, 786-87; PX 3.) At the time he received the assignment, Agent Karaminas had been on the job for a matter of weeks, and this was his second or third lead. (Tr. 309-11, 286, 289.)

Agent Karaminas understood his task to be to "obtain photographs of [the] two individuals" who matched the parameters of the three specific leads provided by Mexico in the March 27, 2006 letter, *i.e.*, the name, Social Security number, and general location of Perpetrator-Simone and Grisard. (Tr. 288; DX A.) Agent Karaminas believed that the third paragraph of the letter described his assignment: "We consider helpful to obtain an [sic] images of the mentioned people, *with the purpose of forward[ing] them to the appropriate authorities, so they can call the victims and witnesses in order to identify the subjects.* Thus, in case the identifications turns [sic] out positive, we will be able to ask for an extradition procedure." (DX A (emphasis added).)

Agent Karaminas searched various private and law enforcement databases, including ChoicePoint, a database that contains general personal information. (Tr. 292-93.) ChoicePoint has a subprogram called "Faces of the Nation" that enables inquiries into more specific parameters, such as Social Security numbers. (Tr. 298.) ChoicePoint also has a parameter field that shows whether individuals are related and the degree of separation from the target individual. (Tr. 299.)

4

Agent Karaminas quickly found a match for Thomas E. Grisard with the same full name and Social Security number in New Jersey as provided by Mexico. (Tr. 294-96.) The person Agent Karaminas identified as Thomas E. Grisard had a criminal history as a child molester, and had previously been incarcerated for sexually assaulting juvenile males, according to the New Jersey Sex Offender Registry. (*Id.*; PX 4.) Agent Karaminas submitted a National Criminal Information Center ("NCIC") request for Grisard, which yielded Grisard's New Jersey Department of Motor Vehicles ("DMV") record and criminal history. (Tr. 293-96*.*)

Agent Karaminas then turned to his search for Phil Anthony Simone. There was no record of anyone with the last name of Simone in the New Jersey Sex Offender Registry. (Tr. 297.) In the Choicepoint database, Agent Karaminas found eleven close matches with the last name Simone in New Jersey—ten named "Philip" and one named "Phil;" of these, two had the middle initial "A.," including the one named "Phil" in the New York/New Jersey area. (Tr. 298 (misidentifying the number as "20 or so"); PX 44 at 9-11.) Agent Karaminas narrowed the search using the SSN [redacted]-1576 provided by Mexico, which was linked to a "Gertrude Simone," and listed an address in New York and a date of birth of October [redacted], 1956. (Tr. 298; *see* DX C.) Agent Karaminas saw from the ChoicePoint Faces of the Nation profile that Gertrude Simone was married to a "Philip A. Simone." (Tr. 299-300.) When Agent Karaminas learned that Gertrude Simone was married to a man named "Philip," he assumed "Philip Simone," *i.e,* Plaintiff-Simone, was the man Mexico sought, *i.e.*, "Phil Anthony Simone." (Tr. 298-99, 304-05.)

In Agent Karaminas's view, Plaintiff-Simone matched all three parameters provided in the request from the Embassy of Mexico: (1) name (considering "Philip A. Simone" a match for "Phil Anthony Simone"); (2) location (New York or New Jersey); and (3) Social Security

number (considering the SSN provided by the Mexican government a match because it belonged to Plaintiff-Simone's wife and was thus linked to the alleged perpetrator). (Tr. 304.) With respect to the variances in the name and Social Security number, Agent Karaminas reasoned that fugitives often use an alias Social Security number, such as that of a relative, in order to conceal their identities, which is an accepted fact in fugitive investigations. (Tr. 304-05.) Thus, Agent Karaminas concluded that Philip A. Simone, *i.e.,* Plaintiff-Simone, identified by the New York DMV information was the Phil Anthony Simone sought by Mexico. (Tr. 303-04.)

Agent Karaminas then submitted a written request to a NCIC operator to run a search on criminal and motor vehicle records under the names "Phil Anthony Simone" and "Gertrude Simone." NCIC requires an identifier, such as date of birth, to run a query. The written request provided Gertrude Simone's Social Security number and her date of birth. (Tr. 300, 303; *see* DX E.) Agent Karaminas found that Plaintiff-Simone had no criminal record. (Tr. 320-21.) In all of Agent Karaminas's subsequent searches for further evidence, he either used the birth date that he had found for Plaintiff-Simone or included the Social Security number for Gertrude Simone. (Tr. 331-35, 341-42, 344-46, 299-302.) He did not search law enforcement databases for any of the other eleven close matches that he found on ChoicePoint, including one "Phil A. Simone." (Tr. 328-31.) Agent Karaminas noticed the discrepancy between "Phil" and "Philip," but believed that "Phil Anthony Simone" was merely using a nickname, albeit in formal documents, and that the discrepancy was therefore unimportant. (Tr. 298, 327-28.)

By an internal memorandum to FOS Norris dated June 5, 2006, Agent Karaminas reported Grisard's and Plaintiff-Simone's addresses and identifying information as responsive to Mexico's request for assistance. (Tr. 305; DX F.) The FBI report synopsis stated: "To advise International Operations of lead being covered. (DX F at FBI 13.) With respect to Plaintiff-

Simone the FBI report stated: "Search of Law Enforcement databases in regards to PHILIP A. SIMONE showed that SIMONE currently holds a New York State motor vehicle operators [sic] license with the following information." (*Id.* at FBI 14.) Therein, Plaintiff-Simone was identified as "Philip A. Simone," not "Phil Anthony Simone." (*Id.*; Tr. 305.) Agent Karaminas transmitted a photograph of Grisard, but with respect to Simone, reported that "[d]ue to the fact that SIMONE holds a New York State motor vehicle operator's license a photograph was unable to be obtained by Newark [FBI office]." (DX F at FBI 14.)

The information that Agent Karaminas sent about Plaintiff-Simone to FBI International did *not* note the difference between Plaintiff-Simone's name and the name Mexico had requested or that the Social Security number that Mexico had provided belonged to Gertrude Simone rather than a Phil or Philip Simone. (Tr. 324-27; PX 2 at FBI 5.) In other words, Agent Karaminas did not point out any inconsistencies between the information that Mexico had provided and the person he identified in the report. (Tr. 340-41; PX 2 at FBI 5.)

In his memorandum to FBI International, Agent Karaminas reported back the name "Thomas E. Grisard" and the Social Security number exactly as it was provided by Mexico to indicate that he had identified the individual requested by Mexico. (PX 2 at FBI 5; Tr. 321, 791-93.) With respect to Plaintiff-Simone, however, Agent Karaminas wrote "Philip A. Simone," not "Phil Anthony Simone," and omitted the Social Security number provided by the Mexican authorities for "Phil Anthony Simone" entirely. (Tr. 813-15, 321-24.) Agent Karaminas believed that it was not within the scope of his duties "to identify the target;" rather, his job was simply to provide Mexico with a picture; "[i]f [he provided] them with the wrong picture, it [was] their job to say this is not the guy we're looking for." (Tr. 815-16.) However, because Plaintiff-Simone lived in New York, Agent Karaminas was unable to obtain a picture of him, and

left it for FBI International to get one through the FBI's Albany Office.  (Tr. 337, 796; PX 2 at FBI 5; Stip. Facts ¶ 4.).  Agent Karaminas instead provided Plaintiff-Simone's address, birth date, and physical description in his memorandum.  (PX 2 at FBI 5; Tr. 306-07, 795-96; Stip. Facts ¶ 3.)

By letter dated August 24, 2006, SSA Butsch of FBI International forwarded the information and picture of Thomas E. Grisard from Agent Karaminas to Mexico, repeating back Grisard's name and Social Security number exactly as they had been provided.  (PX 7; Tr. 799-802.)  SSA Butsch also forwarded the information Agent Karaminas found about Plaintiff-Simone, using the name "Philip A. Simone," not "Phil Anthony Simone" as Mexico had requested, and did not include a Social Security number.  (*See* Tr. 805-06.)  The information provided to Mexico about Plaintiff-Simone included his name, birth date, address, height, and eye color.  (*Id.*)  FBI International obtained a driver's license photograph of Plaintiff-Simone from FBI Albany.  (Tr. 796-98, 806-07; PXs 5 & 8; Stip. Facts ¶¶ 5-9.)  Mr. Butsch transmitted the New York driver's license photograph of Plaintiff-Simone to Mexico's Attoney General's Office, describing it as "a DMV photograph of Phil Anthony Simone."  (PX 9 (DX J);[6] Tr. 807-08; Stip. Facts ¶ 10.)  In his letter, SSA Butsch also stated that "*EOM [Embassy of Mexico] is requested to perform a positive ID and contact*" him or FOS Norris.  (PX 9 (emphasis added).)

No one at the FBI ever advised Mexico that the data it was providing applied to "Philip Simone," not "Phil Anthony Simone," or that the Social Security number that Mexico had provided did not belong to "Phil Anthony Simone" or Plaintiff-Simone.  (*See* PX 7 at FBI 21.)

There is no evidence indicating that the FBI had any communication with Mexico about the Simone/Grisard investigation, or whether Mexico intended to seek extradition of either

_____

[6] PX 9 and DX J are the same document.  The Court will refer only to PX 9.

perpetrator, after the photos and other information were transmitted to Mexico in August 2006. The FBI did not provide its August 2006 correspondence with Mexico to the Department of Justice's Office of International Affairs ("OIA")[7] to alert OIA about a possible extradition request. (Tr. 810.) The FBI had no further involvement with Plaintiff-Simone until May 16, 2008, eleven days after his arrest, when the FBI attended a meeting to determine how the arrest had come about. (Tr. 455.)

### D. OIA & the Extradition Treaty with Mexico

On or about May 25, 2007, pursuant to the protocol discussed below, OIA received a diplomatic note from Mexico's Ambassador to the United States, Arturo Sarukhan, requesting the provisional arrest of "Phil Anthony Simone." (DX L.) The note was submitted to OIA pursuant to the United States-Mexico Extradition Treaty, 31 U.S.T. 5059 (entered into force May 4, 1978) (the "Treaty"), which was in effect in 2008 and is still in effect. (DX R at EDNY 41-60; *see* Tr. 357.)

#### 1. The Treaty

Articles I and II of the Extradition Treaty call upon the United States to extradite persons whom Mexican authorities have charged with an offense listed in the Appendix. (DX R at EDNY 44-45 (Treaty, Art. I, Para. 1; Art. II, Para. 1).) The Appendix includes the offense of "corruption of minors, including unlawful sexual acts with or upon children under the age of consent," the crime with which "Phil Anthony Simone" was charged in Mexico. (*Id.* at EDNY 59 (Treaty, Appx., nos. 5 and 6).)

Article 11(1) of the Extradition Treaty allows Mexican authorities to request the provisional arrest of a person sought to be extradited. (*Id.* at EDNY 51.) An application for a

---

[7] OIA is part of the Department of Justice's Criminal Division.

provisional arrest must contain: "a description of the offense for which the extradition is sought, a description of the person sought and his whereabouts, an undertaking to formalize the request for extradition, and a declaration of the existence of a warrant of arrest issued by a competent judicial authority . . . ." (*Id.*)

Pursuant to the terms of the Treaty, provisional arrest requests must be submitted through diplomatic channels. (*Id.*; Tr. 358.) Therefore, in practice, the Mexican Ambassador to the United States issues a diplomatic note in Spanish with an unofficial translation in English, and provides the original diplomatic note to the State Department, which forwards the note to OIA. (Tr. 358.) Provisional arrests under the Treaty are available under circumstances of urgency, which include situations where there is a fear that the fugitive will flee, the underlying crimes are particularly serious, or the fugitive poses a danger to the community. (Tr. 359.) Crimes involving child predation also give rise to urgency sufficient to support a provisional arrest under the Treaty. (Tr. 443, 554.)

## 2. OIA

OIA is responsible for securing the provisional arrest and return of fugitives from abroad, and for requesting from foreign countries evidence and other assistance needed in U.S. criminal investigations and prosecutions. In this regard, OIA assists state, local, as well as federal prosecutors and law enforcement agents. (Tr. 355, 545-46; PX 12 ¶¶ 4-5.) OIA is also responsible for ensuring that the United States meets its reciprocal obligations to foreign countries with respect to extradition and provisional arrests of fugitives, and the production of evidence, located in the United States. (Tr. 355, 545-46; PX 12 ¶ 5.) OIA thus serves as the central authority for the United States regarding extradition agreements and Mutual Legal Assistance Treaties. (Tr. 354-55, 545-46, 568-69.) In this capacity, trial attorneys at OIA work

with federal prosecutors at United States Attorney's Offices to provisionally arrest and extradite foreign fugitives located in the United States. (Tr. 371.) OIA receives and reviews foreign extradition requests and requests for provisional arrest warrants, and, upon concluding that a request complies with the requirements of the applicable treaty and U.S. law, coordinates with the United States Attorney's Office in the district where the fugitive is believed to be located to seek a provisional arrest warrant or a judicial certification that the fugitive should be extradited. (Tr. 371-72, 546-47, 575-76; PX 12 ¶ 8.)

OIA also has primary responsibility for briefing and advising the Attorney General and other senior Department of Justice officials on international issues, and providing advice to the Attorney General, the Department of Justice, and other U.S. officials on sensitive law enforcement matters that could impact the foreign relations and strategic interests of the United States. (Tr. 548; PX 12 ¶ 12.)

> 3. OIA's Handling of Provisional Arrest Requests from Mexico Under the Treaty

OIA receives and reviews extradition requests and requests for provisional arrest warrants from Mexico to determine whether each request complies with the requirements of the Treaty and U.S. law, so as to support the initiation of extradition or arrest warrant proceedings in the United States. (PX 12 ¶ 14; Tr. 371-72, 552.) This review process involves several steps, aimed at informing OIA's exercise of prosecutorial discretion with respect to whether to send the request to a United States Attorney's Office for execution, or whether to return it to the Mexican government for more information. (*Id.*) Specifically, OIA assesses the sufficiency of provisional arrest requests from Mexico by looking at five factors under the Treaty: identity, location, probable cause, dual criminality, and lapse of time. (Tr. 360-70, 552; PX 12 ¶¶ 15-19 ; PX 10.)

With respect to identity, OIA determines whether the request has identified the fugitive with sufficient specificity. This involves verifying that the request contains a photograph or description of the fugitive, and, if the fugitive's name is a common one, ensuring that the request includes enough additional information about the fugitive to determine which individual with that name is being sought. If OIA determines that the fugitive cannot be identified with sufficient specificity from the request, the Mexican government is requested, through diplomatic channels, to provide additional information, pursuant to Article XII of the Treaty. (PX 12 ¶ 15; PX 10; Tr. 362-63.) While the Treaty does not itself require a photograph, OIA policy requires Mexican officials to provide a photograph because the Marshals cannot confirm a fugitive's location without one. (Tr. 362, 364, 366, 559.)

About a quarter of provisional arrest requests from Mexico do not originally have a photograph when they arrive at OIA, prompting OIA to ask Mexican officials to provide a photograph through supplemental requests. (Tr. 362-63, 563.) OIA next verifies that the request contains sufficiently specific location information to find the fugitive in the United States. This may involve searching available law enforcement and public information databases to confirm the validity of the address contained in the Mexican request, and OIA may also ask the Marshals Service to send local agents to discreetly visit the address to verify that the individual resides there, known as a "discreet locate" search. (PX 12 ¶16; PX 10; Tr. 363, 550.) A discreet locate search entails searching databases, such as DMV or electricity records, to confirm a fugitive's residence. (Tr. 364.) It can also entail talking to postal carriers or discreetly "putting eyes" on the person residing at a particular address, and comparing the person's appearance with the photograph provided by the foreign country. (Tr. 364, 550, 658-59, 662.)

Next, OIA attorneys make a prosecutorial assessment as to whether the materials submitted by the Mexican government in support of the request are sufficient to meet the applicable probable cause requirements. (PX 12 ¶ 17; Tr. 365-66, 552.) Occasionally, OIA may consult with the United States Attorney's Office for the district in which the fugitive is located in making this assessment. (PX 12 ¶ 17.)

OIA construes the probable cause assessment to only require confirmation that the provisional arrest request describes the crime committed with sufficient specificity and that the person sought to be arrested at the location provided is the person identified by Mexico as the target of its investigation. (Tr. 365, 552, 658.) If OIA believes that probable cause is plainly insufficient based on the request, it asks Mexico, through diplomatic channels, to provide additional information in support of the probable cause determination. (PX 12, ¶ 17; Tr. 365-66, 549.)

The purpose of the photograph that is provided by Mexico is to allow the United States Marshals Service (the "Marshals") to visually identify and locate the person being sought in the provisional arrest request. (Tr. 366.) Thus, OIA does not require that the photograph attached to the provisional arrest request be the photograph used to support the underlying probable cause in Mexico, *e.g.*, the photograph identified by victims. (Tr. 399-400, 614; PX 10.)

OIA then conducts a dual criminality analysis to ensure that the activity of which the fugitive is accused is punishable under the laws of both the United States and Mexico by a deprivation of liberty of more than one year, as required by Article II(l) of the Treaty. This step requires a determination as to whether the activity charged in Mexico would be a felony in the United States and in the State where the fugitive is found. (PX 12 ¶ 18; PX 10; Tr. 368-69.)

OIA may request additional information from Mexico about other legal or procedural aspects of the case that require clarification. (PX 12 ¶ 19; PX 10; Tr. 368-69, 551.) It is not uncommon, in assessing extradition or provisional arrest requests, for OIA attorneys to determine that additional information or clarification is required before the case will be referred to a United States Attorney's Office. At times, OIA Attorneys will determine that the request must be administratively closed, either because of a fundamental legal impediment, or because the foreign country has not been able to provide the additional information needed to meet the requirements of the Treaty and U.S. law. (PX 12 ¶ 21; Tr. 369-70, 551.)

OIA policy dictates that the OIA attorney assigned to a request should only forward the request to the appropriate United States Attorney's Office when the OIA attorney is satisfied that the identity, location, probable cause, dual criminality, lapse of time, and other legal or Treaty requirements have been met. (PX 12 ¶ 20; Tr. 371-72, 550-51.) Where OIA attorneys determine that referral is appropriate, prosecutors in the United States Attorney's Office finalize the complaint and affidavit drafted by OIA's Mexico and Central America Team, and then take the lead in procuring the provisional arrest warrant and supervising its execution. OIA attorneys remain closely involved in assisting the United States Attorney's Office in the procuring the warrant. (PX 12 ¶ 22; Tr. 371, 550.)

Discretion plays a large role in OIA's decision-making process with respect to the assessment of provisional arrest requests for compliance with the requirements of the Treaty. OIA attorneys exercise their judgment in evaluating the sufficiency of the facts in a given request against the requirements of the Treaty. (Tr. 552-54.) A number of policy considerations inform the exercise of this discretion: (1) foreign policy considerations, including U.S. treaty obligations; (2) the need for dispatch, including the urgency of the prosecution and the danger

the fugitive poses to the United States; and (3) scarcity of OIA resources. (Tr. 552-54; PX 12 ¶¶ 23-28, 51-54.) The OIA is primarily concerned with foreign policy considerations, and meeting its obligations based on requests from foreign countries, which, in turn, ensures that foreign countries assist the Government with its reciprocal needs. (Tr. 355, 545-46; PX 12 ¶ 24.)

> E. OIA's Review of Diplomatic Notes, the Discreet Locate & Referral to the United States Attorney's Office in this Case

OIA reviewed and processed the May 25, 2007 diplomatic note from Mexico requesting the arrests of Thomas E. Grisard and "Phil Anthony Simone." (PX 11 (DX L)[8].) The note stated that Grisard and "Phil Anthony Simone" had been charged with the crime of child prostitution in Mexico and that a warrant had been issued for their arrest by the Tenth Circuit for Criminal Matters in Puente Grande, Municipality of Tonala Jalisco on April 2, 2004. (*Id.* at OIA 90.) The note also set forth the elements of the crime with which "Phil Anthony Simone" and Thomas E. Grisard were charged, provided explicit details of the alleged child molestation, and identified the Mexican penal code provisions under which these acts were punishable. This information served as the basis for the extradition request. (PX 11.) "Phil Anthony Simone's" address was listed as [redacted], New Hyde Park, New York 11040 (*i.e.*, Plaintiff-Simone's home address), and included a photograph with the header "PHIL ANTHONY SIMONE" at the top. (*Id.* at OIA 90, 95.)

The photograph provided with the diplomatic note was a copy of Plaintiff-Simone's New York DMV photo. (Tr. 413, 683.) The only reference in the note to the photograph described it as "a photograph *of the accused*." (PX 11 at OIA 92; Tr. 381-82, 567-68 (emphasis added).) The note did not specify that the victims had identified the photograph, or how the victims had

---

[8] PX 11 and DX L are the same document. The Court will refer only to PX L.

identified their assailant. Nor did it indicate that Mexican authorities had obtained the photograph purportedly of "Phil Anthony Simone" from the FBI in 2006. (*See* PX 11; Tr. 382.) The note also requested the provisional arrest of Grisard, who was alleged to be residing in New Jersey. (PX 11.)

OIA asked the Marshals to locate the two individuals identified in the diplomatic note. (PX 12 ¶ 31.)[9] The Marshals were able to confirm Grisard's location in New Jersey the same day via a database search. (*Id.*; Tr. 379.) The United States Attorney's Office for the District of New Jersey then sought a provisional arrest warrant against Grisard, and Grisard was arrested on March 12, 2008. (PX 12 ¶ 35; Tr. 723-24.) Grisard waived extradition to Mexico on August 12, 2008, and was extradited to Mexico on August 27, 2008. (PX 12 ¶ 35.)

When the Marshals looked for "Phil Anthony Simone," the database searches were "inconclusive." (*Id.*¶¶ 31-32; Tr. 476-78.) On June 14, 2007, OIA asked the Marshals to confirm the location for Phil Anthony Simone that was listed in the Mexican request, which was Plaintiff-Simone's home address. (PX 13.) The Marshals on Long Island then conducted a "discreet locate" search to confirm Phil Anthony Simone's location. (*Id.*; Tr. 384, 659.)

On July 13, 2007, the Marshals reported back to OIA that they had completed their discreet locate search and that (1) tax records revealed that "Philip Anthony Simone" was the owner of [redacted address], New Hyde Park, NY 11040 (*i.e.*, Plaintiff-Simone's house); (2) DMV records revealed that the "subject" owned a 2002 Toyota Camry registered to that address;

_____

[9] As part of its processing of extradition requests from Mexico around the time of Plaintiff-Simone's arrest, OIA would check the fugitive's identity and whether the fugitive's name was a common one. If the fugitive's identity was not sufficiently established, OIA would request more information from Mexico. (PX 10 at OIA 350; Tr. 369-70.) OIA also looked at the Mexican diplomatic notes for logical consistency. (Tr. 373.) OIA was aware that requests from Mexico demanded heightened attention on the issue of identification. (Tr. 472-73; *see* PX 29.)

(3) such vehicle was observed parked in the driveway of the New Hyde Park address; and (4) the postal inspector confirmed that the "subject" received mail at that same address. (PX 13; Tr. 384, 478-82, 570-71, 624, 661-62.)

On June 22, 2007, OIA asked Mexican officials for more information regarding both Grisard's and Phil Anthony Simone's crimes, namely the ages of the victimized children and whether medical exams had been performed on the victims. OIA requested the children's birth dates to confirm that the crimes charged in the Mexican prosecution were punishable by imprisonment of more than one year in Mexico, since the potential penalties for those crimes vary in Mexico based on the victim's age. OIA also asked for medical exam information to confirm that the victims had been harmed. (PX 12 ¶ 33; Tr. 383-84.)

OIA first received this additional information during a case consultation with Mexican officials in Mexico City in February 2008. (Tr. 385-86.) This information was subsequently memorialized and expanded in writing via email. (Tr. 389-91; DX N (PX 14)[10] at OIA 3-4.) "At some point [around the] case consultations or later," OIA also learned that "Phil Anthony Simone" was identified by the child victims via a passport photograph. (Tr. 398, 484.)[11]

After receiving the additional information, OIA concluded that the provisional arrest request for "Phil Anthony Simone" met all of the requirements of the Treaty, *i.e.*, that it satisfied the requirements of identity, location, probable cause, dual criminality, and lapse of time. (Tr. 392, 552; PX 12 ¶¶ 42-47.) In consultation with the United States Attorney's Office in the Eastern District of New York, OIA decided that the material submitted by Mexico was sufficient

---

[10] PX 14 and DX N are the same document.

[11] There is no evidence that OIA asked, or that Mexico indicated, whether the photograph of "Phil Anthony Simone" provided with the diplomatic note was a passport photograph.

to meet the requirements for a warrant under U.S. law and the Treaty. (Tr. 408, 572-73; PX 12 ¶ 45.)

As part of its five-step analysis, OIA concluded that Mexico's provisional arrest request identified the fugitive, "Phil Anthony Simone," with sufficient specificity, insofar as it contained "a photograph of the accused," which matched the person known to have the address and date of birth provided in the request. (Tr. 381-88, 395-96; PX 12 ¶ 43.) OIA also concluded that there was sufficient information to establish probable cause that the "Phil Anthony Simone" identified in the diplomatic note was the person Mexico was seeking for the commission of the crimes specified in the note. In reaching this conclusion, OIA relied on the detailed information about "Phil Anthony Simone" and his crimes set forth in the diplomatic note, supplemented by the information Mexico provided at the case consultation with OIA. This information included victim statements and their medical information, as well as confirmation by Mexican officials that the victims had positively identified their assailant, "Phil Anthony Simone," from a photograph. The OIA also relied on the fact that the diplomatic note attached "a photograph of the accused" containing the caption "PHIL ANTHONY SIMONE," as well as pedigree information matching the person depicted in the photograph. (Tr. 381-82, 395-97; PX 12 ¶ 45.)

On April 14, 2008, OIA Attorney Andrea Tisi ("Tisi") forwarded Mexico's provisional arrest request, along with information about Plaintiff-Simone, to the United States Attorney's Office for the Eastern District of New York, for execution of the arrest. (Tr. 392-93, 397-98, 482, 818-19; PX 12 ¶ 48.) Assistant United States Attorney ("AUSA") Raymond Tierney was assigned to handle the matter. (Tr. 397-98; PX 17.) After reviewing the request, AUSA Tierney ("Tierney") asked Tisi if she had Simone's passport. She responded that she did not. (Tr. 398.)

On April 22, 2008, after OIA had referred the provisional request to the United States Attorney's Office, the Ambassador of Mexico provided a second diplomatic note relating to Thomas E. Grisard and "Phil Anthony Simone." (PX 18; Stip Facts.¶ 14.) The April 22, 2008 supplemental diplomatic note contained more detail of Grisard's and Perpetrator-Simone's alleged criminal actions, including statements that three of the victims had "fully recognized and identified" their assailant through a photograph appearing in passport number 155378776, issued to PHIL ANTHONY SIMONE." (PX 18 at OIA 102.) The April 22, 2008 diplomatic note contained three kinds of identifying information about "Phil Anthony Simone": a passport number, a name, and a photograph. (*Id.* at OIA 102, 104, 107.) The supplemental note stated that Passport No. 155378776, in the name "Phil Anthony Simone," contained the photograph that was positively identified by the victims. (*Id.* at OIA 102 & 104; Tr. 403-04, 484-85; PX 51 at 1.) *However*, the only photograph attached to the April 22, 2008 supplemental diplomatic note was the *same* photograph of Plaintiff-Simone that had been attached to the May 25, 2007 diplomatic note. In the April 2008 supplemental diplomatic note, the photograph bore the heading, "PHIL ANTHONY SIMONE," and in the May 2007 note, it was described as a "photograph of the accused." (PX 18; PX 11.)[12]

Although not explicitly stated, OIA clearly, albeit mistakenly, assumed that the photograph attached both to the original May 2007 diplomatic note and the April 2008 supplemental diplomatic note was either the photograph that was actually shown to the victims, or a different photograph of the person who was positively identified by the victims. From that

---

[12] Tisi did not obtain a copy of Passport No. 155378776, belonging to "Phil Anthony Simone," or determine whether anyone named "Phil Anthony Simone" (as opposed to Philip A. Simone) had a criminal record or had traveled to Mexico. (*See* Tr. 485-87; PX 51 at 51.) No one from the Government spoke to Thomas E. Grisard, who was in federal detention in Newark, New Jersey about the crime and his accomplice. (Tr. 488.)

point on, the Government proceeded based on the mistaken belief that Plaintiff-Simone was the fugitive sought by Mexico for the commission of child corruption and prostitution crimes.

F. Provisional Arrest Warrant

Towards the end of April 2008, the case was reassigned from AUSA Tierney to AUSA Richard Lunger ("Lunger"). (Tr. 566.) AUSA Lunger had the May 25, 2007 and April 22, 2008 diplomatic notes in his case file, and reviewed them. (Tr. 566-67.) Tisi assured AUSA Lunger that the photograph from Mexico fairly and accurately depicted the accused in Mexico. (Tr. 596.)

On or about April 30, 2008, AUSA Lunger informed Deputy United States Marshal ("DUSM") Roy Wright ("Wright") of the Marshals' Fugitive Task Force ("Fugitive Task Force") in Central Islip, New York, that he (Lunger) was in the process of preparing a provisional arrest warrant for Plaintiff-Simone based on a request from Mexico. (*See* Tr. 570-71, 622-23.) AUSA Lunger asked DUSM Wright to ensure that the Fugitive Task Force, which would execute the warrant and effectuate the arrest, was able to locate and positively identify the individual to be arrested. (*Id.*)

The primary duty of the Fugitive Task Force is to locate a fugitive once the requesting authority has made a proper request. (Tr. 621-22.) The Fugitive Task Force generally is not involved in investigating the underlying crime for which the fugitive is sought. (Tr. 622.) Rather, it is the Fugitive Task Force's duty to apprehend, arrest, and transport the fugitive for legal proceedings instituted by the requesting authority. (Tr. 621-24.)

AUSA Lunger informed DUSM Wright that the Marshals had conducted a discreet locate search about a year earlier, and requested confirmation that the fugitive still resided at [redacted address], New Hyde Park, New York (*i.e.*, Plaintiff-Simone's home address). (Tr. 623.) DUSM

Wright confirmed Plaintiff-Simone's address through a review of Long Island Power Authority utility records and by confirming with the United States Postal Service that Plaintiff-Simone still received mail at that address. (Tr. 625-26.) DUSM Wright also conducted a NCIC criminal history check on Plaintiff-Simone, which came back negative. (*Id.*)

To ensure that the Fugitive Task Force could physically identify Plaintiff-Simone and that the person who was the subject of the warrant was the same person depicted in the photograph provided by Mexico, DUSM Wright obtained a New York DMV photograph of Plaintiff-Simone through law enforcement sources, using the name and address provided by Mexico. (Tr. 570-71, 579, 625-27.) A comparison of the photograph provided by Mexico and the photograph obtained from the New York DMV showed that they depicted the same person. (*Id.*)

On May 2, 2008, AUSA Lunger filed a Complaint and Affidavit in Support of Application for Arrest Warrant ("Arrest Affidavit"). (PX 22 (DX R)[13].) The Arrest Affidavit attached translations of the May 25, 2007 and April 22, 2008 diplomatic notes and a copy of the Plaintiff-Simone's DMV photograph provided by Mexico. (*Id.*) The Arrest Affidavit stated that the Marshals had positively identified "Phil Anthony Simone" by comparing a DMV photograph of Plaintiff-Simone with the photograph that had been provided by Mexico, although only one photograph was attached to the Arrest Affidavit. (*Id.* at EDNY 39, 70; *see* Tr. 574-75; PX 52.) The factual representations in the Arrest Affidavit were drawn from the two diplomatic notes, and from the information that Tisi and the Marshals had provided to AUSA Lunger. (Tr. 573.) Based on AUSA Lunger's Affidavit, as supported by the Mexican diplomatic notes, Magistrate

---

[13] PX 22 and DX R are the same document. The Court will refer to PX 22.

Judge Arlene R. Lindsay issued a warrant on May 2, 2008 for Plaintiff-Simone's arrest. (*Id.; see* DX S.)

### G. May 5, 2008 – Attempted Arrest at Plaintiff-Simone's House

Early on the morning of May 5, 2008, a team of eight Fugitive Task Force members, including DUSM Wright, met near Plaintiff-Simone's house in order to plan the execution of his arrest warrant. (Tr. 629; DX S.) Around 7:00 or 7:30 am, the arrest team drove to Plaintiff-Simone's house. (Tr. 630-31.) Two Marshals went to cover the back of the house, while the rest went to the front of the house. (*Id.*) The Marshals wore badges around their necks and their customary raid jackets bearing the words "POLICE—U.S. MARSHALS" in 5-6" yellow lettering. (Tr. 630; 638-39.) DUSM Wright knocked on the door at Plaintiff-Simone's residence, and his wife, Gertrude Simone, answered. (Tr. 631, 71-73.) DUSM Wright identified himself and the Fugitive Task Force, and asked to enter the house. Thinking that the Marshals had come to the wrong house, Mrs. Simone agreed. (*Id.*) Plaintiff-Simone's step-daughter and son were also in the house at that time. (Tr. 70-71.)

Once inside, DUSM Wright informed Mrs. Simone that the Marshals were there to arrest Plaintiff-Simone. Mrs. Simone told DUSM Wright that her husband had already left for his job at Merrill Lynch in New Jersey. (Tr. 631.) A group of Marshals in New Jersey were dispatched to Merrill Lynch to take Plaintiff-Simone into custody, while DUSM Wright and the other Marshals remained at Plaintiff-Simone's home. (Tr. 633-34.)

DUSM Wright informed Mrs. Simone that there was a warrant from Mexico for the arrest of her husband on serious charges, although he did not initially tell her the specific charges. (Tr. 74, 92, 640-41, 631, 632-33.) Mrs. Simone told DUSM Wright that her husband had never been to Mexico and that he did not have a passport. (Tr. 74, 94, 632-33.) DUSM Wright believed

Mrs. Simone. (Tr. 634-36.) He took a written statement of her concerns, which she signed. (*Id.*) DUSM Wright told Mrs. Simone that he would look into her claims. (Tr. 637-38.) However, DUSM Wright did not have the authority to call off the arrest. (*Id.*)[14]

The Marshals remained at the Plaintiffs' house until they received confirmation that the arrest had been made in New Jersey, which took place by 9:30 a.m. (Tr. 634-35.) Around the time the Marshals left the Simones' residence, DUSM Wright called Tisi to inform her that the arrest had been made. (Tr. 636-37.) He also relayed Mrs. Simone's claims about her husband's innocence. (*Id.*) DUSM Wright asked Tisi to check into how Plaintiff-Simone had been identified by the Mexican authorities. (*Id.*)

### H. Plaintiff-Simone's Arrest

On May 5, 2008, at approximately 8:30 a.m., Plaintiff-Simone was led away from his desk at work, in view of his colleagues (Tr. 120-21), by Merrill Lynch security and taken down to a private security room in the lobby of the building (Tr. 163-65). He was not in handcuffs at the time. (*Id.*)

In the private security room, Plaintiff-Simone learned that a warrant had been issued for his arrest in Mexico. (Tr. 121-23, 166.) Despite Plaintiff-Simone's protestations that he had not been to Mexico in twenty years, the Marshals read Plaintiff-Simone his *Miranda* rights, patted him down for about ten seconds, and placed him under arrest. (*Id.*) Plaintiff-Simone became nervous and sweaty, started to shake, and suffered a colitis attack. (Tr. 122.) Plaintiff-Simone was told that he was being taken to Newark for extradition. (Tr. 123, 166.) He thought that he was going to be put on a plane to Mexico, and would never see his family again, although no one

---

[14] Prior to Mrs. Simone's statement, DUSM Wright had no reason to believe that the person depicted in the photograph attached to the provisional arrest request was not the person wanted by Mexico. (Tr. 637.)

ever told him that. (*Id.*) Plaintiff-Simone was in the Merrill Lynch security room for about an hour. (Tr. 121-22.)

Plaintiff-Simone repeatedly asked to use the bathroom because he was having physical symptoms of colitis, but for almost an hour, the Marshals did not allow him to use a bathroom. (Tr. 125-26, 166.) Finally, at about 9:30 a.m., Plaintiff-Simone was allowed to use a bathroom without restraint, but he was required to use it with the door open and a Marshal standing at the door. (*Id.*) Plaintiff-Simone was humiliated by having to use the bathroom under these circumstances. (Tr. 125-26.)

As he was being transported to the federal court house in Newark, Plaintiff-Simone told the Marshals, "you have the wrong guy," and "I'm a family guy." (DX K; Tr. 127-28.) At the courthouse, Plaintiff-Simone was fingerprinted, had a mugshot taken, and was strip searched and patted down, including on his buttocks. (Tr. 130-32, 169.)

Plaintiff Simone was then cuffed again, and placed in a cell in a detention area in the courthouse with two other detainees. (Tr. 140; 170.) In the cell, there was a toilet in the middle of the room without a partition or any privacy barrier. (Tr. 133-35.) Plaintiff-Simone, suffering from aggravated colitis all day, was required to use this toilet at least twice in the presence of two other prisoners, which caused him extreme humiliation. (*Id.*) Plaintiff-Simone spent a total of about four hours in the holding cell. (Tr. 170.)

Plaintiff-Simone was taken to the courtroom in handcuffs and shackles. (Tr. 66, 136.) He was publicly charged as a fugitive from justice and as having engaged in the corruption and prostitution of children. (Tr. 752.)

I.  <u>May 5, 2008 – Post-Arrest</u>

Around 9:30 a.m. on May 5, 2008, Tisi called AUSA Robert Kirsch ("Kirsch"), the AUSA from the District of New Jersey who had handled the Grisard provisional arrest request. (Tr. 726.)  Grisard had been arrested in mid-March 2008 without issue. (Tr. 719, 723.)  Tisi asked AUSA Kirsch to handle Plaintiff-Simone's initial appearance scheduled for that afternoon before then-Magistrate Judge Michael A. Shipp in the District of New Jersey.  (Tr. 726.)  Upon reviewing the relevant documents, AUSA Kirsch noticed that there was a discrepancy with respect to Simone's listed birth date: the Simone arrest warrant used the birth date of Thomas E. Grisard (which did not match either Perpetrator-Simone's or Plaintiff-Simone's birth date), and the May 2007 diplomatic note listed a 1958 birth date for "Phil Anthony Simone," which differed by a year from Plaintiff-Simone's 1957 birth date.  (PX 26 at OIA 38; DX L; Tr. 393-94, 571, 730-35, 757.)

Around the same time, DUSM Wright called Tisi to raise his concerns that Plaintiff-Simone was not in fact the perpetrator of the underlying crime.  (Tr. 635-36.).  Specifically, DUSM Wright told Tisi that he believed Mrs. Simone when she said that Plaintiff-Simone had not been to Mexico at the relevant time.  He also told Tisi that the photograph of Plaintiff-Simone provided by Mexico was a New York DMV photograph, and instructed Tisi to ask Mexico where they had obtained it.  (Tr. 409-10, 416-18, 635-37; *see* Tr. 663-64.)

Tisi immediately contacted Mexico regarding DUSM Wright's questions.  (PX 24 at DOS 3; Tr. 411-16; *see* Stip. Facts ¶¶ 19-20.)  At 10:28 a.m., Tisi sent an email to Mexican authorities asking them to confirm "how Mexico obtained the photo of Simone that was part of the provisional arrest package."  (PX 24 at DOS 3.)  She also asked, "[w]ho has identified the photo as that of the person who sexually molested Martin N and possibly other boys?"  (DX W at

OIA 41; Tr. 413.) Tisi also inquired as to who had identified the person depicted in that particular photograph as the person who had sexually molested the boys. (Tr. 416-17.)

At 10:30 a.m., Tisi forwarded the prior email to AUSA Kirsch, DUSM Sean Fahey ("Fahey"), DUSM Wright, AUSA Lunger, and Michael Krantz (Tisi's paralegal at the time). (DX W at OIA 41; Tr. 419.) At 11:30 a.m., AUSA Kirsch replied that the United States needed the answers as quickly as possible, as his initial discussions with defense counsel indicated that they might have arrested the wrong person. AUSA Kirsch wanted to be able to articulate to the judge at 2:30 that afternoon why the Government thought they had the right person. (DX W at OIA 41; Tr. 419-20.) Tisi forwarded this information to the Mexican authorities at 11:32 a.m. (DX W at OIA 41; Tr. 421.)

At 12:45 p.m., Tisbe Cazares ("Cazares"), a Mexican prosecutor who happened to be in the office that day, which was Cinco de Mayo, a national holiday in Mexico, responded that the victims had identified Simone from his passport photograph. (DX W at OIA 41.) At 1:39 p.m., Cazares emailed Tisi the passport photo of "Phil Anthony Simone" that the Mexican victims had identified. (PX 24 at DOS 2; Stip. Facts ¶ 21; DX 1 at OIA 40; *see* PX 51 at 1; Tr. 423.) At 1:48 p.m., Tisi responded to Cazares, copying AUSA Kirsch and DUSM Fahey, that the passport photo of the "Phil Anthony Simone" looked different than the picture that Mexico had sent in its provisional arrest application (*i.e.*, the photo of Plaintiff-Simone), and asked for more information from Mexico because, "[w]e're fearful we have the wrong person arrested." (PX 25.) At 2:26 p.m., Cazares sent Tisi an email stating that she agreed that the passport photograph and the photograph in the provisional arrest application were of different individuals. (*Id.*)

Based on the above, at Plaintiff-Simone's initial appearance before Magistrate Judge Shipp at approximately 2:30 that afternoon (PX 24), AUSA Kirsch requested Simone's

immediate release on bond. (Tr. 742.) Under OIA policy, bail and release are not available in extradition or provisional arrest cases. (Tr. 743.) Rather than adhering to OIA's general policy, AUSA Kirsch sought release at Plaintiff-Simone's initial appearance, because of the discrepancy in birth dates, the poor quality of the photographs purportedly of the perpetrator submitted by Mexico earlier that day, and "some common sense" relating to the disparities between Grisard and Plaintiff-Simone, *e.g.*, Grisard had a criminal record for the very same offense and lived in Guadalajara at some point, whereas Plaintiff-Simone did not. (Tr. 738-42.) Plaintiff-Simone was released that day, May 5, 2008, on an appearance bond of $250,000 secured by his house. (Tr. 742-48.)

An identification hearing was set for a week later, May 12, 2008. (DX W at OIA 38.) The date was set by agreement between AUSA Kirsch and Plaintiff-Simone's defense attorneys, who needed time to develop conclusive evidence that Plaintiff-Simone was not in Mexico at the time the offenses were committed in 2002. (Tr. 747, 764.)

At 5:10 p.m. on May 5, 2008, AUSA Kirsch informed Tisi and DUSM Fahey, among others, that the person he observed in the courtroom that day, Plaintiff-Simone, bore no resemblance to the person depicted in the passport photograph shown to the victims. (PX 25 at OIA 38.) AUSA Kirsch reported that Plaintiff-Simone told Pretrial Services that he had not been out of the country in thirty years, and had not had a passport for decades. (*Id.*) By 5:21 p.m. on, May 5, 2008, Tisi wrote an email to AUSA Kirsch stating:

> Based on the passport copy that we received today, the Marshals have identified someone in Florida with the same name, and POB [place of birth] as the passport (and possibly DOB [date of birth].) That person has a 1997 conviction for sexual assault. The Marshals are trying to get a photo of that person and to determine when he was released from prison on the 1997 conviction.
>
> We will hear back from Jalisco tomorrow (as today is Cinco de Mayo) about how they obtained the photo they included in the provisional arrest request that turned

out to be of the Simone who was arrested this morning in New Jersey. I will let you know as soon as I hear anything more.

(PX 26.)[15]

Meanwhile, upon his release, Plaintiff returned to his home, and began frantically searching for proof that he was not in Mexico at the time the underlying crimes were committed in 2002. (Tr. 140-41, 66-67; *see* Tr. 79.) He also called Merrill Lynch seeking proof that he was working in Jersey City on the day of the crime in Mexico, but no one at Merill Lynch would return his calls. (Tr. 141-43.)

J. Subsequent Events

By email at 11:46 a.m. on May 6, 2008, Tisi emailed Katya Lopez, the Mexican prosecutor responsible for the Simone file, asking Lopez to advise Tisi whether the provisional arrest request had identified the correct individual, *i.e.*, the perpetrator of the underlying crime. (DX W at EDNY 15; Tr. 438.) If it was not the right person, Tisi wrote, Mexico should submit a new diplomatic note attaching the photograph of the correct person to be arrested. (Tr. 438-39.) This would allow the United States to both withdraw the Simone arrest warrant and pursue the provisional arrest of the Perpetrator-Simone, assuming he was in the United States. (*Id.*)

On May 6, 2008, the Marshals obtained a detailed New Jersey criminal history printout about "Phil Anthony Simone" ("Offender-Simone"). (PX 47 at USMS 6.) It showed that Offender-Simone had been arrested for sexual assault, lewdness, and endangering the welfare of children, and convicted of two counts of aggravated sexual assault. (*Id.*) It also showed that Offender-Simone had been incarcerated in the Adult Diagnostic and Treatment Center in Avenel,

---

[15] The information about the discrepancy between the passport photograph and Plaintiff-Simone's DMV photograph, and the Marshals' identification of a Florida man with the same name and a prior sexual assault conviction was not disclosed to Plaintiff-Simone or his attorneys prior to the dismissal of the charges against Plaintiff-Simone. (*See* Tr. 143-46.)

New Jersey with Thomas E. Grisard. (*Id*. at USMS 6-7; PX 6; Tr. 721-22). As a sex offender, Offender-Simone, identified as "Phil Anthony Simone," had registered an address in Jalisco, Mexico. (PX 36 at OIA 63, 65; Tr. 343.)

On May 7, 2008, Tisi expressed urgency in an email about whether the case should be dismissed immediately based on what the Government knew. (PX 30; Tr. 503-05; Stip. Facts ¶ 25.) At 11:10 a.m., AUSA Kirsch responded:

> I do not believe we need to dismiss immediately as I've bought us until at least Monday [May 12, 2008] (that's when I had the ID hearing set).
>
> I am having the defense lawyer try to establish to my satisfaction that Mr. Simone was in fact working on March 22, 2002, in NJ, and thus could not be in Mexico on that day.
>
> Toward that end, his lawyer has advised me this morning that they have a receipt of an ATM withdrawal, at 9:01 a.m., in Jersey City (where he works), in the amount of $500, on Friday March 22, 2002 (the day of the child rapes). I have also been advised that on the next day, Saturday March 23, the family is providing their lawyers with EZ pass records which I'm told indicate that his vehicle registered an EZ Pass debit to and from NJ (it appears that he returned on Sunday), where [Plaintiff]-Simone's sister lives.
>
> Additionally, albeit self-serving, his lawyers have advised that this Mr. Simone has never met, and never heard of, Grisard, with whom he supposedly raped the Mexican boys.
>
> It appears to me, absent compelling information to the contrary, that this is likely the wrong Simone. Let us all try to establish to all of our satisfaction a correct and proper outcome as quickly as possible.

(PX 31 at NJ 5.)

Tisi asked the Marshals to obtain a color copy of Perpetrator-Simone's passport photograph, which they were able to quickly do. (Tr. 822, 511-12, 692-93, 708-09; PX 51 at USMS 20, 16.) At 4:25 p.m. on May 6, 2008, DUSM Fahey forwarded to Tisi a photograph of Offender-Simone, with his date of birth, noting that Offender-Simone had been convicted in New Jersey in 1997 for aggravated sexual assault. (PX 32.)

At 5:49 p.m. on May 7, 2008, Tisi emailed Ms. Lopez a copy of the photograph obtained by the Marshals of Offender-Simone, so that Mexican officials could show the photograph to the victims. (Tr. 444; DX W at OIA 43.) Tisi reiterated the request for another diplomatic note. (Tr. 446.)

On May 8, 2008, Ms Tisi received a request from Mexico for help in obtaining a "color copy of the passport of Phil Anthony Simone, passport number 155378776 issued June 8, 1997 and expiring June 7, 2007." (PX 35.) At 11:33 a.m. that day, still not having received an additional diplomatic note, Tisi emailed Mexican official Leopoldo Velarde to again request a diplomatic note indicating that "Mexico included the wrong identifying information in its original provisional arrest; wrong photo, wrong date of birth, wrong address." Tisi requested this note in order to withdraw the arrest warrant against Plaintiff-Simone. (Tr. 447; DX W at EDNY 12-13.)

At 12:51 p.m., also on May 8, 2008, AUSA Kirsch sent an email to Tisi and others indicating that defense counsel for Plaintiff-Simone had provided a monthly attendance record showing that Plaintiff-Simone was at work on the day in 2002 when the offense took place. (DX W at EDNY 12.) By 1:32 p.m. that day, the Government was prepared to withdraw the warrant, and expunge Plaintiff-Simone's arrest record, without waiting for a supplemental diplomatic note from Mexico. (*Id.*; Tr. 452.) At 1:43 p.m., Tisi informed Mexican officials that the prosecutor in New Jersey had been instructed to dismiss the criminal complaint against Plaintiff-Simone. (PX 34.) The following day, May 9, 2008, the Government notified Plaintiff-Simone's attorneys that it would dismiss the case against Plaintiff-Simone, and thereafter AUSA Lunger obtained an order dismissing the criminal complaint. (Tr. 144, 585; DX Y.)

On May 9, 2008, DUSM Fahey informed Tisi that, as a sex offender, Offender-Simone was required to register any change of address with the State of New Jersey. DUSM Fahey told Tisi that Offender-Simone had registered an address in Jalisco, Mexico on January 16, 2002, shortly before the crimes there in March of 2002 that were the subject of the diplomatic notes. (PX 36.)

On May 9, 2008, AUSA Lunger moved for and obtained an order to dismiss the criminal complaint against Plaintiff-Simone without prejudice. (Tr. 582-85; DX Y; Stip. Facts ¶ 27.) The subsequent order to expunge Plaintiff-Simone's record was signed by Magistrate Judge Lindsay on May 22, 2008, and AUSA Lunger then took numerous steps to ensure that the record of Plaintiff-Simone's arrest was expunged from any and all law enforcement databases. (Tr. 147, 585-90; *see* DXs KK & MM.)

On May 10, 2008, Mexican official Leopoldo Velarde informed Tisi that the picture and date of birth Mexico sent with its diplomatic note had been provided by SSA Michael Butsch of the FBI. (PX 37 at NJ 28; Stip. Facts ¶ 28.)

On May 12, 2008, Plaintiff-Simone's attorney, Kelly Daniels, requested that AUSA Kirsch provide a letter for Plaintiff-Simone's employer that he was arrested in a case of mistaken identity. (Tr. 775.) AUSA Kirsch agreed, and provided that letter on May 15, 2008. (*See* DX JJ & LL.)

On May 16, 2008, representatives of the Mexican Attorney General's Office ("PGR"), and the Mexican Foreign Ministry, OIA, the State Department, the FBI, and the Marshals held a meeting to discuss the Simone arrest. (Tr. 455.) This meeting was the FBI's first involvement with the arrest of Plaintiff-Simone since it had provided Plaintiff-Simone's photograph to Mexico in August 2006. The FBI did not learn until after the arrest, and shortly before this

meeting, that Mexican officials had attached that photograph to their provisional arrest request, and had apparently done so without showing the photograph to the victims to obtain positive identification, as the FBI had asked them to do in 2006. (*See* DX Z.)

At the May 16, 2008, meeting, "PGR expressed deep regret for this error." (Tr. 457; DX Z at OIA 303.) Also at that meeting, "OIA requested, and PGR agreed, that [henceforth] Mexico would attach a photo to a provisional arrest request and would say where the photo came from and who identified the photo as the person who committed the crime." (Tr. 457; DX Z at OIA 303). This was a diplomatically-negotiated change in policy from OIA's previous protocols with Mexico. (Tr. 458-59, 562-63.)

By diplomatic note dated June 11, 2008, Mexico requested the provisional arrest of Offender-Simone. Because the United States had information that Offender-Simone was in the Dominican Republic, OIA administratively closed the file without action. (Tr. 459, 461; DX AA.)

       K.  <u>Damages</u>

Plaintiffs are not claiming lost wages or seeking economic damages of any type in this case, and they adduced no evidence at trial of any such damages. Rather, Plaintiff-Simone claims emotional, psychological, and/or reputational injuries. Plaintiff Gertrude Simone claims loss of consortium actually and proximately caused by her husband's arrest and/or detention.

       1.  <u>The Arrest – May 5, 2008</u>

On May 5, 2008, Simone was in the custody of law enforcement from approximately 8:30 a.m. to 4:30 p.m., or about eight hours in total, of which approximately four hours were spent in a holding cell. (Tr. 154.) After May 5, 2008, Simone was never again in the custody of law enforcement, nor did he ever have to return to court. (*Id.*)

### 2. Pre-existing Conditions

Plaintiff-Simone has received treatment for panic attacks, anxiety, and depression since 2001. He has been taking Lexapro since at least 2006. Simone's primary care physician, Dr. Timothy Robinson, provided him with several notes for his employer, prior to the date of his arrest, asking that he be excused from work due to these conditions of panic, anxiety, and depression. (Tr. 190, 199; *see* DXs CC, DD, EE & FF.) Plaintiff-Simone also suffered from colitis. (Tr. 119, 125).

### 3. Post-Arrest

After his arrest, Plaintiff-Simone had to take two months off from work because he "was not in a right frame of mind" and knew he could not concentrate to perform his job. (Tr. 146-47.) Plaintiff-Simone never saw a mental health professional prior to the week of May 5, 2008, but felt the need to see a psychologist at least once a week afterwards. (Tr. 149, 192, 243, 249; DX NN.) His pre-existing anxiety condition was aggravated. The dosage of his anxiety medication was doubled after his arrest. (Tr. 83, 148-49, 151, 244, 248, 249; DX NN.)

Plaintiff-Simone also suffered aggravated colitis as a result of the events of the week of May 5, 2008. (Tr. 148, 151.) He did not take blood pressure medication before that week, but began taking it afterwards. (Tr. 149.)

Plaintiffs' family and friends perceive that Plaintiff-Simone is more lethargic post-arrest. (Tr. 61, 67-68, 82-83, 248-249; DX NN.) Plaintiff-Simone is concerned about the way people feel about him as a result of his arrest for a heinous crime. (Tr. 150, 200-01.)

Plaintiff Gertrude Simone's relationship with her husband, including their intimate relationship, has suffered as a result of the events of the week of May 5, 2008. (Tr. 82-85, 152-53.)

Simone's employer, Merrill Lynch, was satisfied with the letter provided by AUSA Kirsch indicating that Plaintiff-Simone was arrested in a case of mistaken identity. (Tr. 156-157; *see* DX LL.) The Winthrop Foundation, through Merrill Lynch, paid the entirety of Simone's legal fees associated with his arrest, including $5,000 that he had borrowed from his mother. (Tr. 161.)

## II. Relevant Procedural Background

### A. Plaintiffs' Claims

After exhausting their administrative remedies, Plaintiffs commenced this action on September 10, 2009. (Dkt. 1 (Compl.) ¶ 4; Dkt. 19 (Ans.) ¶ 4.) Plaintiffs' complaint asserted three tort claims against the United States: (1) negligence, (2) false arrest, and (3) malicious prosecution. The complaint also asserted a derivative loss of consortium claim on behalf of Plaintiff Gertrude Simone.

### B. Prior Rulings in this Litigation

The Honorable Thomas C. Platt previously dismissed Plaintiffs' false arrest claim in its entirety.[16] (*See* Dkt. 18 (Memorandum and Order dated June 17, 2010) at 28-30 (dismissing false arrest claims as to the federal prosecutors for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), based on the intentional tort exception to the FTCA); Dkt. 65 (Amended Memorandum and Order dated October 9, 2012) at 19-20 (dismissing false arrest claim based on the actions of the FBI and Marshals, for failure to state a claim under Fed. R. Civ. P. 12(b)(6)).)

Judge Platt further dismissed the malicious prosecution claim as to the federal prosecutors, including the OIA attorneys, for lack of subject matter jurisdiction based on the intentional tort exception to the FTCA. (Dkt. 18 at 30.) Plaintiffs also waived any malicious

---

[16] This case was reassigned to the undersigned on April 18, 2013.

prosecution claim on the basis of the FBI's conduct.  (*See* Tr. at 8-9; *see also* Dkt. 63 (Pl. Reply. Mem. on Mot. for Recon.) at 2 ("the actions of the FBI were too attenuated from the arrest to support a malicious prosecution claim").)  However, Judge Platt held that Plaintiffs' malicious prosecution claim could survive to the extent that it was based on the actions of the Marshals. (Dkt. 65 at 20-25.)

The negligence claim, which survived in its entirety, is based on the actions of the prosecutors, the Marshals, and the FBI in New Jersey and the District of Columbia.  The loss of consortium claim is derivative of the other substantive tort claims, and survived for trial given that the negligence and malicious prosecution claims remained.

C. Jurisdictional Overview

Plaintiffs bring this suit pursuant to the FTCA, which waives the sovereign immunity of the United States for certain torts committed by federal employees within the scope of their employment.  Specifically, 28 U.S.C. § 1346(b)(1) gives federal courts jurisdiction over claims brought against the United States for:

> injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Judge Platt previously held that the substantive tort law of New Jersey governs Plaintiffs' causes of action in this case, primarily because the "last events necessary to allegedly make the United States liable . . . occurred in New Jersey."  (Dkt. 18 at 25.)

### III.    Conclusions of Law

#### A.    Malicious Prosecution

Plaintiffs bring their malicious prosecution claim based only on the actions of the Marshals.  Under New Jersey law, for Plaintiffs to prevail on their claim of malicious prosecution, they must prove by a preponderance of the evidence that: (1) the Marshals instituted a criminal proceeding against Plaintiff-Simone; (2) such action was motivated by malice on the part of the Marshals; (3) there was an absence of probable cause to prosecute him; and (4) the action was terminated favorably to him.  *See LoBiondo v. Schwartz*, 199 N.J. 62, 90 (2009) (citing *Lind v. Schmid*, 67 N.J. 255, 262 (1975)); *see also Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 248 (3d Cir. 2001) (enumerating the same four elements under New Jersey law).

There is no doubt that the underlying criminal proceeding terminated in Plaintiff-Simone's favor.  The other three elements are in dispute.

With respect to the first element, the Marshals did not institute a criminal proceeding against Plaintiff-Simone.  The Government's procurement of a provisional arrest warrant at the request of a foreign sovereign in connection with an extradition request pursuant to a viable international treaty does not constitute institution of a criminal proceeding by the Government.

Courts have consistently differentiated international extradition proceedings from criminal actions because "ultimate culpability will not be determined in the United States." *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976); *see also Ex Parte La Mantia*, 206 F. 330 (S.D.N.Y. 1913) (holding that Sixth Amendment rights apply only to criminal prosecutions that take place in the United States, and not extradition proceedings); *see also Spatola v. United States*, 741 F.Supp. 362, 370 (E.D.N.Y. 1990) ("[E]xtradition proceedings are neither criminal

trials nor full-blown civil actions; they are administrative in character, and, as such, are not burdened with the legalism and formalities with which American courts are familiar."). Here, culpability for the underlying crime that gave rise to the extradition request would have been determined in Mexico, not the United States. *See Melia v. United States*, 667 F.2d 300, 302 (2d Cir. 1981) (an extradition proceeding, unlike a criminal trial, is not intended to adjudicate the accused's innocence or guilt; the court's function is to determine whether there is competent legal evidence to justify extradition according to the treaty); *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980) ("An extradition proceeding is not a criminal trial in which the guilt or innocence of an accused is adjudicated. The purpose of the hearing is simply to determine whether the evidence of the fugitive's criminal conduct is sufficient to justify his extradition under an appropriate treaty. The Federal Rules of Criminal Procedure are not applicable. Neither are the evidentiary rules of criminal litigation. Hearsay evidence is admissible. Unsworn statements of absent witnesses may be considered. There is no inherent right to the confrontation and cross-examination of witnesses.")

Furthermore, as a factual matter, there is no evidence that the Marshals took "some 'affirmative action by way of advice, encouragement, pressure, *etc.*, in the institution, or causing the institution, of the prosecution [assuming there was a prosecution] or in affirmatively encouraging its continuance after it has been instituted [if it ever was].'" *Robinson v. Winslow Twp.*, 973 F. Supp. 461, 473-74 (D.N.J. 1997) (quotations and citations omitted). The Marshals did not determine whether Plaintiff-Simone, once arrested, should be released or kept, nor did they urge or support the prosecution of Plaintiff-Simone. (Tr. 677-78 (DUSM Fahey testifying, *inter alia*, that it is not a function of the Marshals to advise prosecutors on whether to go forward

once an arrestee is located).)[17]  Without such evidence, the Court cannot find that the Marshals initiated the criminal proceeding against Plaintiff-Simone.

With respect to the second element of a malicious prosecution claim, Plaintiffs presented no evidence that the Marshals acted maliciously.  *See Morales v. Busbee*, 972 F.Supp. 254, 261 (D.N.J. 1997) ("Actual malice in the context of malicious prosecution is defined as either ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose.").  To the contrary, it was largely due to the Marshals' diligence that Plaintiff-Simone's release was put into motion expeditiously.  As discussed in the Court's Findings of Fact, almost immediately after Marshals left the Simones' residence, DUSM Wright called Tisi to relay his concerns about Plaintiff-Simone's arrest, and asked Tisi to determine how Plaintiff-Simone had been identified by the Mexican authorities.

Similarly, the Marshals cannot be found to have acted maliciously, or even negligently, with respect to the discreet locate search that it conducted in April 2008, shortly before Plaintiff-Simone's arrest.  Although DUSM Wright deduced, but did not tell AUSA Lunger, that the photograph Mexico sent with the provisional arrest request was a DMV photograph, and not a passport photograph (Tr. 642-43, 596-97), there is no evidence that DUSM Wright was aware, or had any reason to be aware, of the potential relevance of this fact.  Furthermore, even if DUSM Wright knew that the victims had identified Perpetrator-Simone via a passport photograph, it still would have been reasonable for DUSM Wright to believe that the individual depicted in the DMV photograph sent by Mexico was the same person identified by the victims.  Indeed, as happened in this case, foreign investigators regularly seek assistance from U.S. investigators in

---

[17] Indeed, as noted below, if anything, the Marshals *prevented* Plaintiff-Simone from being prosecuted, since it was DUSM Wright who initiated the inquiry that led to Plaintiff-Simone's release and exoneration.

obtaining DMV, arrest, or other photographs of suspects contained in U.S. databases. DUSM Wright reasonably could have believed that the DMV photograph of Plaintiff-Simone was obtained in this manner by Mexican authorities and that the Mexican authorities had confirmed that the DMV photograph depicted the same person identified by the victims, whether by comparing the DMV and passport photographs, or by showing the DMV photograph to the victims. While the Mexican authorities apparently failed to do so, this critical lapse was not the fault of the Marshals. Accordingly, the Court does not find that the Marshals acted with malice.

Given that Plaintiffs have failed to prove, by a preponderance of the evidence, two of the four elements of their malicious prosecution claim, the Court finds in favor of the United States on this claim.

B. Negligence

Plaintiffs' negligence claim is based on the alleged actions of the federal prosecutors at OIA and the United States Attorney's Office in Newark, the Marshals, and the FBI.

1. Negligence Based on the Prosecutors' Actions

As noted above, the FTCA waives the sovereign immunity of the United States for certain torts committed by federal employees within the scope of their employment. 28 U.S.C. § 1346(b)(1). "Substantively, the FTCA makes the United States liable to the same extent as a private individual under like circumstances, under the law of the place where the tort occurred, subject to enumerated exceptions to the immunity waiver." *Levin v. United States*, 133 S. Ct. 1224, 1228 (2013) (internal citations and quotation marks omitted). The specific statutory exception relevant in this case is 28 U.S.C. § 2680(h) ("§ 2680(h)"), which, *inter alia,* preserves the federal government's immunity from suit on "[a]ny claim arising out of . . . malicious prosecution." This is known as the "intentional tort exception." *Levin* 133 S. Ct. at 1228. The

intentional tort exception does not apply to "investigative or law enforcement officers of the United States Government[,]" and thus they may be held liable for torts committed within the scope of their employment.  28 U.S.C.A. § 2680(h).

The federal prosecutor defendants—the AUSAs and OIA attorneys and staff—are not "law enforcement officers" within the meaning of § 2680(h) because they are not empowered by law to execute searches, seize evidence, or make arrests.  *Id.*  ("For the purpose of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.")  Thus, intentional tort claims predicated on the actions of federal prosecutors fall outside the FTCA's waiver of sovereign immunity, and are barred by § 2680(h).  *See, e.g.*, *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994) ("The FTCA authorizes suits for abuse of process based only on the actions of federal investigative or law enforcement officers, not on the actions of government prosecutors."); *id.* at 104 (claims of malicious prosecution cannot be advanced under the FTCA to the extent that they are "based upon the actions of Government prosecutors"); *see also Moore v. United States*, 213 F.2d 705, 708 (D.C. Cir. 2000) (federal prosecutors do not fall within the meaning of "investigative or law enforcement officers" within the FTCA).

Based on this precedent, Judge Platt dismissed Plaintiffs' *false arrest* and *malicious prosecution* claims against the federal prosecutors.  (Dkt. 18 at 30.)  However, the prosecutorial exemption under § 2680(h) *also* applies to Plaintiffs' *negligence* claim against the prosecutors because this claim "arises out of" the false arrest and malicious prosecution claims that are barred by § 2680(h), and that have already been dismissed as to them.

In *United States v. Shearer*, 473 U.S. 52 (1985), the Supreme Court addressed the issue of whether the survivor of a serviceman, who was murdered by another serviceman, could recover from the Government under the FTCA for negligently failing to prevent the assault and battery of the murdered serviceman. *Id.* at 53-54. Assault and battery, like malicious prosecution and false arrest, is exempted from the FTCA's waiver of sovereign immunity under § 2680(h). After restating the proposition that the FTCA's waiver does not apply to "[a]ny claim arising out of assault [or] battery," the Court held that:

> Section 2680(h) does not merely bar claims *for* assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery. We read this provision to cover claims like respondent's that sound in negligence but stem from a battery committed by a Government employee.

*Shearer*, 473 U.S. at 55 (emphasis in original); *see also Lambertson v. United States*, 528 F.2d 441, 443-45 (2d Cir. 1976) (quoting *Laird v. Nelms*, 406 U.S. 797, 802 (1972) ("to permit plaintiff to recover by 'dressing up the substance' of battery in the 'garments' of negligence would be to 'judicially admit at the back door that which has been legislatively turned away at the front door'")).

In determining whether a claim is barred under § 2680(h), courts look to the gravamen of the claim, and not to a plaintiff's theory of liability or characterization of the claim. *See*, *e.g.*, *Dorking Genetics v. United States*, 76 F.3d 1261, 1265 (2d Cir. 1996) (citing *Lambertson*, 528 F.2d at 443). As the Second Circuit made clear in *Lambertson*, "[a] plaintiff may not by artful pleading avoid the statutory exceptions to the FTCA. 'In determining the applicability of the § 2680(h) exception, a court must look, not to the theory upon which the plaintiff elects to proceed, but rather to the substance of the claim which he asserts.'" 528 F.3d at 443.[18]

---

[18] "The scope of § 2680(h) is a matter of federal law." *Johnson by Johnson v. United States*, 788 F.2d 845, 850-851 (2d Cir. 1986) (citing *United States v. Neustadt*, 366 U.S. 696, 705-06 (1961)

Here, although Plaintiffs' claim against the federal prosecutors sounds in negligence, it plainly "arises out of" the intentional torts of false arrest and malicious prosecution. The gravamen of this claim is that the prosecutors were negligent in preventing Plaintiff-Simone from being falsely arrested and maliciously prosecuted. (*See* Dkt. 65 at 17 (asserting that the Government owed Plaintiffs a duty of care to determine that "[Plaintiff-]Simone was the 'Phil Anthony Simone' identified by the victims before it applied for an arrest warrant").[19] Count I of the amended complaint, which sets forth Plaintiffs' negligence claim, expressly alleges that "the negligence and gross negligence of the defendant *were a proximate cause of the false arrest* of Simone." (Am. Compl. ¶ 36 (emphasis added)). Thus, the alleged false arrest or malicious prosecution of Plaintiff-Simone is a *sine qua non* of recovery for Plaintiffs' negligence claim. Plaintiffs, however, "cannot avoid the reach of § 2680(h) by framing [their] complaint in terms of negligent failure to prevent" intentional torts for which federal prosecutors have immunity under the FTCA. *Shearer*, 473 U.S. at 55. Therefore, Plaintiffs' claims based on the actions of

---

("Whether or not this analysis accords with the law of States which have seen fit to allow recovery under analogous circumstances, it does not meet the question of whether this claim is outside the intended scope of the Federal Tort Claims Act, which depends solely upon what Congress meant by the language it used in § 2680(h).")

[19] Judge Platt's opinion, on which Plaintiff relies, recognized that that the gravamen of this case is an injury based on an alleged false arrest and malicious prosecution:

> Here[,] the last events to allegedly make the United States liable for the Marshals' actions, Plaintiff's arrest, occurred in New Jersey. Up until Plaintiff was arrested and placed in federal custody, there was no tort. Had the U.S. sought and obtained a warrant, but on the way to arrest Plaintiff realized its error and turned around, there would have been no injuries, no torts and presumably no lawsuit.
>
> \*       \*       \*
>
> And as discussed, *Plaintiff's injuries arose out of his arrest, processing, arraignment and jailing* − events that took place in New Jersey.

(Dkt. 18 at 25-26 (emphasis added).)

the federal prosecutors at the United States Attorney's Offices and OIA are barred by § 2680(h), and must be dismissed for lack of subject matter jurisdiction.[20]

2.   Negligence Based on the Actions of the FBI and Marshals

In determining whether there exists a cause of action for negligence against the FBI and Marshals under the FTCA, the Court looks to applicable State law.  *See* 28 U.S.C. § 1346(b)(1) (federal jurisdiction over negligence claims against federal employees exists where "the United States, if a private person, would be liable to claimant *in accordance with the law of the place where the act or omission occurred*") (emphasis added).  As noted above, Judge Platt previously determined that the substantive tort law of New Jersey applies to this case.[21]   However, contrary to Plaintiffs' contention, New Jersey law does not recognize a tort predicated on an allegedly negligent law enforcement investigation that resulted in an arrest and/or prosecution.

The facts at issue here are analogous to those in *Drisco v. City of Elizabeth*, No. 09-397 (JAG), 2010 WL 1253890 (D.N.J. Mar. 23, 2010).   There, the plaintiff was proven innocent three years after being indicted in State court on murder charges.  *Drisco*, 2010 WL 1253890, at *2, 4.   The plaintiff then sued, asserting claims for negligent investigation and malicious prosecution against the Union County Prosecutor's Office and numerous individual defendants,

---

[20]  Furthermore, even if the Court were to find that a negligence claim could be brought under the FTCA against the federal prosecutors based on the alleged false arrest and malicious prosecution of Plaintiff-Simone, the Court would find that the prosecutors acted reasonably with respect to Plaintiff-Simone's arrest.  The fundamental breach of duty that resulted in the erroneous and unfortunate arrest of Plaintiff-Simone's was committed by the Mexican authorities when they failed to confirm that the DMV photograph of Plaintiff-Simone depicted the same person identified by the victims, and then forwarded the DMV photograph of Plaintiff-Simone to the Government on two occasions, both times incorrectly representing that the photograph depicted the fugitive sought by Mexico.

[21]  Although Defendant challenges Judge Platt's ruling, asserting that New York law applies, the Court need not revisit that decision, given its conclusion that, like New York law, New Jersey law does not recognize a cause of action based on an allegedly negligent law enforcement investigation.

including six assistant prosecutors from the County Prosecutor's Office and nine Union County detectives and investigators.  *Id.* at *1.  The court dismissed the plaintiff's negligent investigation claim, holding that, "[b]ecause New Jersey law does not recognize 'improper investigation' as an independent cause of action in a malicious prosecution action, Plaintiff's "improper investigation" claim fails as a matter of law."  *Id.* at *14.

The holding in *Drisco* was based on an unanimous opinion of the New Jersey Supreme Court that "categorically denied the existence" of a negligent investigation claim.  *Id.* (citing *Brunson v. Affinity Fed. Credit Union*, 199 N.J. 381, 403, 972 A.2d 1112, 1125 (2009)).  In *Brunson*, the New Jersey Supreme Court rejected the "creation of a new cause of action for negligent investigation as a surrogate for a traditional malicious prosecution claim."  972 A.2d at 1125.  The court explained that such a cause of action would amount to a "'negligence back door' that avoids the intentionally difficult requirements for a malicious prosecution claim and, thereby renders those requirements irrelevant."  *Id.*

Applying *Brunson* and *Drisco*, the Court finds that there is no basis under New Jersey law to hold the United States liable for the allegedly negligent investigation of the FBI or Marshals in connection with the arrest of Plaintiff-Simone.  Accordingly, the Court finds in favor of the United States on Plaintiffs' negligence claim with respect to the conduct of the FBI and Marshals.

### C.  Loss of Consortium

A loss of consortium claim is a derivative tort claim.  *Reed v. Medford Fire Dep't*, 806 F.Supp.2d 594, 606 (E.D.N.Y. 2011); *accord Griffin v. Garratt–Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996); *Clarke v. City of N.Y.*, 82 A.D.3d 1143, 1144, 920 N.Y.S.2d 913 (2d Dep't 2011).  Because all of Plaintiffs' other claims fail, so too does this loss of consortium claim.

**CONCLUSION**

For the foregoing reasons, the Court finds in favor of Defendant the United States on Plaintiffs' malicious prosecution and negligence claims. Plaintiffs recover nothing. The Clerk is respectfully directed to terminate this matter.

SO ORDERED:


 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: January 30, 2015
        Brooklyn, New York